## 2011 VT 45

## DOWNTOWN BARRE DEVELOPMENT v. GU MARKETS OF BARRE, LLC

[22 A.3d 1174]

No. 10-035

¶ 1. April 20, 2011. Landlord, Downtown Barre Development, appeals from the trial court's denial of its request for declaratory relief. Landlord argues that tenant, GU Markets of Barre, LLC, has established a corporate structure that entitles landlord to terminate the parties' commercial lease. Landlord claims the trial court erred in not considering tenant's conduct when deciding whether tenancy under the terms of their agreement may be terminated. We affirm.

¶ 2. The underlying facts are uncontested. In 1973, landlord entered into a lease agreement with Grand Union Stores, Inc. of Vermont (Grand Union) for a commercial property in downtown Barre. The initial lease provided for a twenty-year term of occupancy with four options to renew, for five years each. In 1981, two additional five-year renewal options were added through modification, resulting in a potential fifty-year lease terminating in 2023. Grand Union exercised several of the optional renewals but, in 2000, underwent bankruptcy and liquidation proceedings. Pursuant to the bankruptcy court order, C & S Wholesalers, Inc. purchased many of Grand Union's assets and created Grand Union Markets, LLC to hold them. C & S then organized a separate limited liability corporation for each individual former Grand Union property. C & S established tenant to operate the store at the center of this dispute. In December 2000, the bankruptcy court approved the transfer of the Grand Union lease to tenant. In 2002, tenant assigned the lease to Maxi Drug, Inc., but retained primary liability under the lease. The Jean Coutu Group was Maxi Drug's parent company, but in 2007, it was acquired by Rite Aid Corporation. Despite these various changes in the sublessee, tenant currently remains primarily liable under the lease.

¶ 3. The leased property consists of one large unit, a 26,000-square-foot space, attached to a group of smaller retail store spaces. Under the lease, tenant pays a fixed rent of $3.30 per square foot plus a percentage based rent derived from the annual gross sales volume. The lease expressly provides for two situations in which landlord is entitled to terminate the lease. Paragraph fifty-five permits termination for unpaid rent; it is uncontested that all rent payments are current. Paragraph four controls the ability of either party to terminate the lease following an assignment or sublet by tenant. That paragraph explains:

> The Tenant may assign this lease or sublet the demised premises, or any part thereof, for the purpose herein permitted, or for any other lawful use which will not be extra hazardous on account of fire without relieving the Tenant, however, from its obligations hereunder. In the event the above tenant assigns this lease or sublets the demised premises, or any part thereof, during the initial term of this lease, the Tenant herein may, *by notice to the Landlord*, terminate any and all obligation or liability of the Tenant herein hereunder accruing after the expiration of the initial term of this

lease, and in the event of an assignment or subletting during a renewal term, the Tenant herein may, *by notice to the Landlord,* terminate any and all obligation and/or liability of the Tenant named herein accruing after the expiration of such renewal term.

It is agreed, however, that the *Landlord shall have the right to cancel and terminate this lease without further liability of either party to the other at such time as the Tenant's liability hereunder shall cease pursuant to the foregoing.*

(Emphases added.)

¶ 4. The dispute between the parties originated during Grand Union's bankruptcy proceedings when C & S was permitted to purchase the lease. In 2002, assigned lessee, Maxi Drug, began renovations on the leased premises, dividing the area in two parts, leasing half to a subtenant, and using the other half to operate a retail drugstore. Landlord challenged the assignment in court and sought declaratory relief as to whether tenant's attempts to "persuade [landlord] to treat Maxi Drug as the tenant and to treat [tenant] as only 'secondarily liable' " constituted sufficient notice of reduced liability as required to terminate the lease. Landlord obtained an injunction, prohibiting tenant from assigning the lease, but the trial court found that landlord did not have the right to terminate the lease without direct notice from tenant of reduced liability.[*] Tenant appealed,

and in 2004, this Court affirmed the trial court's finding that landlord did not have the right to terminate the lease but reversed the finding that prohibited tenant from assigning the lease. See *Downtown Barre Dev. v. C & S Wholesale Grocers, Inc.,* 2004 VT 47, ¶ 17, 177 Vt. 70, 857 A.2d 263 [hereinafter *DBD I*].

¶ 5. In 2009, landlord filed a new suit on several grounds, including claims for damages, but primarily requesting declaratory relief on claims that: (1) tenant "taking control of electrical supply to outdoor lighting was a material breach which justifies termination of the lease"; and (2) tenant's "status as a 'shell corporation' is the equivalent of notice" to landlord of tenant's reduced liability under the lease. The parties agreed "there [was] no dispute . . . that [tenant was] a corporation without employees, a bank account, or current income." Similarly, there was no dispute that tenant's financial status "differ[ed] markedly" from that offered to the bankruptcy court where tenant and other "special purpose entities" were described as "operating stores that generated significant cash flow" in order to "provide comfort to landlords that all future obligations can be performed as required under the respective leases." There was a jury trial on claims for damage to the premises and a bench trial on the declaratory request.

¶ 6. In response to landlord's complaint, with the exception of the claim relating to control over electric power to outside lighting, which is not on appeal, tenant moved for judgment as a matter of law. The trial court granted tenant's motion and denied landlord's request for

---

[*] The trial court in the current action clarified that "[t]he original assignment of the lease from Grand Union Stores Inc. of Vermont to [tenant] is an example of a lease assignment which could have supported a termination of the lease. Due to its bankruptcy and ultimate dissolution, the original tenant was no longer liable under the terms of the lease. The parties agree that the assignment to [tenant] was effective because the bankruptcy court exercised its authority to override the assignment clause and order an assignment to [tenant]."

declaratory relief. The court found that landlord's right to terminate the lease is directly conditioned upon actual cessation of tenant's liability and that tenant's financial status did not constitute cessation of that liability. The court concluded that "so long as the original tenant remains legally responsible for performance, the lease can be assigned to a third party" and "[i]n the absence of evidence that [tenant] is no longer liable for performance, the court rejects the claim that [landlord] may terminate the lease." This appeal followed.

¶ 7. The crux of landlord's claim is that the trial court erred in failing to consider tenant's conduct when assessing whether its liability and financial obligations had been reduced under the lease. Specifically, landlord contends that in *DBD I* the trial court and this Court recognized that certain conduct could constitute notice of disclaimed liability, as referenced in paragraph four of the lease, and that therefore tenant's corporate structure and financial status should be considered when determining whether landlord is entitled to terminate the lease. Landlord argues that due to tenant's lack of financial assets, in the event an assignee discontinues rent payment, tenant will be unable to fulfill its obligations under the lease and landlord will have limited recourse to recover lost rent or income.

¶ 8. Our review of a grant of judgment as a matter of law is de novo, and our standard of review is the same as that applied by the trial court. *Field v. Costa*, 2008 VT 75, ¶ 14, 184 Vt. 230, 958 A.2d 1164. The movant is entitled to judgment as a matter of law only when no genuine issue of material fact exists. V.R.C.P. 56(c)(3).

¶ 9. When interpreting a contract we will only stray from plain language where the terms are unclear or ambiguous. See *KPC Corp. v. Book Press, Inc.*, 161 Vt. 145, 150, 636 A.2d 325, 328 (1993) ("Where the terms of a lease are plain and unam-

biguous, they will be given effect and enforced in accordance with their language."). When the language of an agreement is clear, this Court must interpret the intentions and understanding of the parties as they are declared within the agreement. *Lamoille Grain Co. v. St. Johnsbury & Lamoille County R.R.*, 135 Vt. 5, 8, 369 A.2d 1389, 1390 (1976). We find the terms of the lease here unambiguous.

¶ 10. Paragraph four of the lease specifies that tenant "may assign this lease or sublet the demised premises . . . without relieving the Tenant, however, from its obligations hereunder." The paragraph goes on to create an exception to this liability retention language, permitting tenant, "by notice to the Landlord, [to] terminate any and all obligation and/or liability . . . accruing after the expiration of the [current] term" of the lease. Once tenant gives this notice to landlord, "the Landlord shall have the right to cancel and terminate this lease without further liability of either party to the other." This language explains how and when the lease may be terminated in association with its assignment to a third party. Under its terms, in order for landlord to terminate the lease, tenant must first make an assignment and second, give notice of its intent to reduce or terminate its liability. In this case, there is no question that there has been an assignment, therefore we focus on the question of the required notice.

¶ 11. The lease does not define the term "notice," and landlord fails to offer any persuasive definition of "notice" to show that tenant's conduct or status is sufficient to fulfill the requirement specified in the lease. Cf., e.g., 9 V.S.A. § 4451 (defining "actual notice" for residential rental agreements as "receipt of written notice hand-delivered or mailed to the last known address."); see also Black's Law Dictionary 1164 (9th ed. 2009) (specifying "actual notice" as "[n]otice given directly

to, or received personally by, a party."). Landlord does not contend that tenant has given any formal statement — written or oral — suggesting that it disclaims liability. In fact, tenant stated during the bench trial that the current subtenant, Rite Aid, is "prepared to guarantee" the lease if landlord so requests, and tenant has continued to fulfill its obligations under the lease regardless of its current financial status.

¶ 12. Landlord argues that tenant's liability is reduced due to its lack of financial wherewithal and that this potential inability to perform its duties under the lease constitutes notice of termination of liability. Although it is true that tenant no longer maintains a bank account, financial statements, or profit and loss statements, has no employees, does not file a tax return, and generates no income, landlord's argument fails because by its terms, the lease does not impose any financial requirements on the lessee. Landlord's knowledge of tenant's reduced financial capabilities does not constitute notice of reduced liability as defined under the lease, and landlord makes no complaint — nor could it — that tenant has failed to fulfill all lease requirements. Therefore tenant has done nothing to reduce its obligations under the lease, and landlord has not been put on notice of tenant's intent to reduce its liability.

¶ 13. Landlord contends that in the previous litigation the trial court and this Court indicated that certain conduct on the part of tenant can trigger landlord's right to terminate the lease. This contention rests on the trial court's statement that "[tenant] has not actually engaged in specific conduct that reduces its liabilities to [landlord], nor given notice that it has terminated its obligations," and this Court's statement that "[landlord] has failed to demonstrate that the trial court erred in finding that [tenant] has not engaged in any conduct that reduced its liability to [landlord], and that in fact

[tenant] had repeatedly confirmed its continuing obligations and liabilities under the lease." *DBD I*, 2004 VT 47, ¶ 17. Landlord's contention misconstrues this Court's decision. In *DBD I* this Court recognized, "[t]he lease *gives the tenant the option*, following assignment or subletting, to disclaim liability under the contract, which would trigger the landlord's right to terminate the lease." *Id.* (emphasis added). Here, tenant has not notified landlord of intent to "disclaim liability," and the lease does not provide landlord with the option to terminate based on tenant's financial or corporate status. In fact, the lease specifically prohibits termination based upon any breach other than tenant's notice of reduced liability or failure to pay rent: "[b]reach of any covenant of this lease, except a covenant to pay rent, shall not entitle the Landlord to forfeiture of the term hereof." As noted, rent payments have always been current.

¶ 14. In essence, landlord's claim is for anticipatory repudiation. See Restatement (Second) of Contracts § 253 (1981). Repudiation occurs when one party to a contract makes a statement to the other indicating that they will breach, or when "a voluntary affirmative act which renders" one party "unable to perform" occurs. *Id.* § 250; see also *Record v. Kempe*, 2007 VT 39, ¶ 15, 182 Vt. 17, 928 A.2d 1199 (explaining, "[w]hen one party repudiates a contract, the other party is discharged from her duties under the contract and may bring an action for breach" and defining repudiation in accordance with the Restatement). Even assuming landlord could rely on this common law principle, tenant has not indicated to landlord the intent to breach, nor has tenant committed an act that renders it "unable to perform." To the contrary, tenant has offered a guarantee of the lease from its current subtenant and continues to fulfill its obligations under the lease. Accordingly, because the language of the lease is

clear and unambiguous and tenant's conduct does not constitute notice as required by the plain language of the lease, we affirm the trial court's ruling that landlord is not entitled to terminate the agreement on this ground.

*Affirmed.*